USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: May 7, 2008

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------X
CSI INVESTMENT PARTNERS II, L.P.,
Delaware limited partnership, CIS
ACQUISITION PARTNERS, L.P., a Delaware
limited partnership, CANTERBURY MEZZANINE
CAPITAL, L.P., a Delaware limited
partnership, DAVID C THOMPSON, M. GERARD
KEEHAN, VINEET PRUTHI, DONALD J. SHEA, JAMES
M. ROTHE, MICHAEL COSSEL, JOHN J. ADAMS,
ROBERT E. RICHARDSON, MARILYN SCHWARTZ,
and CHARLES CAUDLE,
               Plaintiffs,

          -against-                    00 Civ. 1422
                                    ORDER

CENDANT CORPORATION, a Delaware
corporation, HENRY SILVERMAN, SAMUEL
KATZ, and COSMO CORIGLIANO,
              Defendants.
--------------------------------------------X

DEBORAH A. BATTS, United States District Judge.

    Plaintiffs CSI Investment Partners II, L.P., CIS Acquisition

Partners, L.P., Canterbury Mezzanine Capital, L.P., David C.

Thompson, M. Gerard Keehan, Vineet Pruthi, Donald J. Shea, James

M. Rothe, Michael Cossel, John J. Adams, Robert E. Richardson,

Marilyn Schwartz, and Charles Caudle (collectively referred to as

"Sellers" or "Plaintiffs") sued Defendants Cendant Corporation

("Cendant"), Henry Silverman, Samuel Katz, and Cosmo Corigliano

based on alleged violations of a Stock Purchase Agreement

("SPA").

    The SPA provided for the sale of Credentials Services

International, Inc. ("Credentials") by Sellers to Cendant for a set price of $125 million, plus an additional amount which was contingent on Credentials' future performance ("earnout"). Plaintiffs alleged, <u>inter alia</u>, that Cendant violated the terms of the SPA (Section 5.11) that operated as promises to use certain marketing strategies to market Credentials' products and by not informing them about a wide-scale accounting fraud within Cendant's ranks.  Cendant, while conceding the existence of "accounting irregularities" among its ranks, asserted that it did not fraudulently omit or misrepresent any information in the course of the SPA negotiations, and did not violate the SPA.

On September 7, 2007, the Court issued an Opinion which, in relevant part, granted summary judgment for Plaintiffs on Count III, Cendant's breach of Section 5.11 of the Stock Purchase Agreement.[1]  <u>CSI Investment Partners II, L.P. v. Cendant Corp.</u>, ("<u>Cendant</u>"), 507 F.Supp.2d 384 (S.D.N.Y. 2007).  Familiarity with the Court's Opinion in this matter is presumed.

Cendant has moved for reconsideration of the Court's

---

[1] The Court also: granted in part and denied in part Defendant Cendant's Motion for Summary Judgment; granted Defendants Silverman and Katz' Motion for Summary Judgment; granted Counterclaim-Defendants' Motion for Summary Judgment on the Counterclaims; granted Plaintiffs' Motion for Summary Judgment on Count Four of the Third Amended Complaint; granted in part and denied in part Plaintiffs' Motion for Sanctions for Pervasive Discovery Abuse and Spoliation of Evidence.

2

decision to grant summary judgment for Plaintiffs on Count III.
True to form, parties in this action have submitted a flurry of
motions, cross-motions, statements, letters, and "contingent"
motions.  Now before the Court is Cendant's Motion for
Reconsideration (along with Plaintiffs' Opposition and Cendants'
Reply), Plaintiffs' Cross-Motion to Strike Certain Affidavits
(Cendant's Opposition and Plaintiffs' Reply), and Plaintiffs'
Contingent Motion for Reconsideration (Cendant's Opposition and
Plaintiffs' Reply).  Cendant has also submitted a new Rule 56.1
Statement, including new declarations, which Plaintiffs oppose on
the grounds that it is "a belated attempt to respond to facts
affirmatively raised by Plaintiffs in connection with the
underlying summary judgment motion, but voluntarily ignored by
Plaintiffs."  (Pls'. Opp. New 56.1 at 3.)  Plaintiffs have
submitted their own "Response to Defendant Cendant Corporation's
Improper Statement Pursuant to Local Civil Rule 56.1 and
Statement of Additional Material Facts in Opposition to Defendant
Cendant Corporation's Motion for Reconsideration."  (Id.
generally.)

## DISCUSSION

The standard for granting a motion to reconsider "is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked -- matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." Shrader v. CSC Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995); see also Range Road Music, Inc. v. Music Sales Corp., 90 F. Supp. 2d 390, 392 (S.D.N.Y. 2000) (holding that a motion for reconsideration "is appropriate only where the movant demonstrates that the Court has overlooked controlling decisions or factual matters that were put before it on the underlying motion . . . and which, had they been considered, might have reasonably altered the result before the court.").

Furthermore, a motion for reconsideration is not one in which a party may reargue "those issues already considered when a party does not like the way the original motion was resolved." In re Houbigant, Inc., 914 F. Supp. 997, 1001 (S.D.N.Y. 1996). Thus Local Rule 6.3 should be "narrowly construed and strictly applied" to avoid repetitive arguments already submitted to the Court. National Congress for Puerto Rican Rights v. City of New York, 191 F.R.D. 52, 53 (S.D.N.Y. 1999) (citation omitted). Moreover, the parties "may not address facts, issues or arguments

4

not previously presented to the Court," <u>U.S. Titan v. Guangzhou</u> <u>Zhen Hua Shipping Co., Ltd.</u>, 182 F.R.D. 97, 100 (S.D.N.Y. 1998) (citations omitted), because a motion to reconsider should never act "as a substitute for appealing from a final judgment." <u>Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.</u>, 170 F.R.D. 111, 113 (S.D.N.Y. 1997) (citation omitted).

Cendant asserts four principal arguments in favor of reconsideration: 1) that Cendant was not on notice that summary judgment could be entered against them on Count III and were therefore prejudiced by the Court's entry of judgment on an "incomplete" record, 2) that the terms "reasonable commercial efforts" and "general historical practices" are ambiguous and not appropriate for summary judgment, 3) that genuine issues of material fact remain, and 4) the Court's damages calculation was incorrect.  Cendant has not put forward any decision or fact that the Court overlooked in rendering the September 7, 2007 decision. However, as discussed <u>supra</u>, even granting consideration of evidence not previously presented to the Court there are still no genuine issues of material fact that warrant a trial.

I.    Cendant Argues that It Was Not on Notice To Show A
Genuine Issue of Material Fact as to Count III.

Cendant first argues that it was not on notice "that it
would be called upon to show a genuine issue of material fact on
any" of the "disputed elements in Count III." (Def. Mot. for
Recon. at 7.)  Cendant argues that although they moved for
summary judgment on Count III their motion was "extremely narrow"
addressing only one part of Plaintiffs' breach of contract claim.
(Id. at 8.)  Further, Cendant argues that in light of the
procedural posture in which the statements of material fact were
presented it had no "reason or occasion to dispute Plaintiffs'
56.1(b) account of the parties' discussions or to offer all of
its evidence supporting the other side of the story." (Id. at
11.)

In fact, though Cendant now claims lack of notice, Point IV
of Plaintiffs' brief in opposition to Defendants' motion for
summary judgment was entitled  "Plaintiffs, Not Cendant, Are
Entitled to Summary Judgment on Their Contract and Accounting
Claims." (Pls'. Mem. of Law Opp. to S.J. at 36.)  Further,
despite Plaintiffs' submission of evidence calling into question
Defendants' performance under the contract, Cendant's Reply
Memorandum of Law in favor of their summary judgment motion
failed entirely to address their own performance under the

6

contract, or the evidence presented by Plaintiffs that they had

failed to perform.  (Pls'. Opp. New 56.1 at Gen. Ob. 2 at 5;

Defs. Rep. Mem. of Law S.J. at 16-17.)

The Court is unpersuaded by Cendant's argument that it was

prejudiced by lack of notice prior to the Court's entry of

summary judgment.  Nevertheless, Cendant's claim is ultimately

unsuccessful because even after the presentation of new evidence

for this motion Cendant has failed to come forward with evidence

that creates a genuine issue of material fact for trial.  (See

infra III.)

II.  Summary Judgment is Appropriate Even Where
Ambiguity Exists in the Construction of a Contracts
Terms

Cendant argues that, "the interpretation of an ambiguous

contract based on extrinsic evidence is an issue of fact

unsuitable for summary judgment."  (Def. Recon. Mem. of Law at

12.)   Cendant cites the following passage in support of its

motion:

Ascertaining whether the language of a contract is
clear or ambiguous is a question of law to be decided
by the court.  Mellon Bank, N.A. v. United Bank Corp.
of New York, 31 F.3d 113, 115 (2d Cir. 1994).
Contract language is ambiguous if it is "capable of
more than one meaning when viewed objectively by a
reasonably intelligent person who has examined the
context of the entire integrated agreement...."

7

Sayers v. Rochester Tel. Corp. Supplemental Mgmt.
Pension Plan, 7 F.3d 1091, 1095 (2d Cir. 1993).
(internal quotations omitted). No ambiguity exists,
however, "when contract language has a definite and
precise meaning, unattended by danger of
misconception ... and concerning which there is no
reasonable basis for a difference of opinion." Id.
(internal quotations omitted).

Lucente v. International Business Machines Corp., 310 F.3d 243,
257 (2d. Cir. 2002) (citing caselaw (Sayers) relied upon by this
Court in its September 7, 2007 opinion at Cendant, 507 F.Supp at
413).

As the Court has already noted, the terms of the contract at
issue here ("reasonable commercial efforts" and "historical
practices"), though ambiguous, are appropriate for summary
judgment. Cendant, 507 F.Supp.2d at 413. The Circuit has stated
that courts "may resolve the ambiguity in the contractual
language as a matter of law if there is no extrinsic evidence to
support one party's interpretation of the ambiguous language or
if the extrinsic evidence is so one-sided that no reasonable
factfinder could decide contrary to one party's interpretation."
Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill
Lynch, Pierce, Fenner & Smith Inc., 232 F.3d 153, 159 (2d. Cir.
2000) (citations omitted).

This is such a "one-sided" case. On the record presented to
the Court for summary judgment, the meaning of the terms was

8

virtually undisputed by Cendant.  Consequently, the relevant

inquiry is whether "there is no genuine issue as to any material

fact," Fed.R.Civ.P. 56(c), "a situation that obtains not only

when the language [of a contract] is unambiguous, but also when

the language is ambiguous and there is relevant extrinsic

evidence, but the extrinsic evidence creates no genuine issue of

material fact and permits interpretation of the agreement as a

matter of law," Shepley v. New Coleman Holdings Inc., 174 F.3d

65, 72 (2d Cir. 1999) (citing Nycal Corp. v. Inoco PLC, 988

F.Supp. 296, 299 & nn.9-11 (S.D.N.Y. 1997), aff'd, 166 F.3d 1201

(2d Cir. 1998)).  Cendant has produced no new decision that would

alter the Court's view that the extrinsic evidence as to the

meaning of those terms and the intent of the parties is so one-

sided as to present a matter of law appropriate for summary

judgment.  The record remains so heavily weighted in favor of

Plaintiffs' interpretation of the terms that a reasonable juror

could accept no other interpretation.

> III. Even Considering the Additional Evidence Provided by
> Cendant There is No Genuine Issue of Material Fact
> Warranting a Trial on Count III.

Cendant argues that if it had been on notice prior to the

Court's entry of summary judgment it would have presented the

9

following evidence: testimony of Cosmo Corigliano and Anne Pember who "were unavailable during fact discovery in this case" and "a declaration on behalf of Samuel Katz on topics not explored by Plaintiffs' counsel during his deposition." (Def. Recon. Mem. of Law at 11.) Cendant has now submitted those declarations along with a new Rule 56.1 statement and attachments, which Plaintiffs oppose as improper.

Plaintiffs oppose the 11th hour submission of these additional facts asserting that "Corigliano and Pember have consistently relied on the Fifth Amendment as an excuse to frustrate discovery in this case" and argue that "[t]he law clearly prohibits such blatant deceit and gamesmanship." (Pls'. Recon. Opp. Mem. of Law at 4-5.) Further, Plaintiffs argue that the Katz declaration should be stricken because it contradicts his deposition testimony. (Id. at 5; discussed infra.)

By way of background, these Declarations are the first the Court has heard from Corigliano or Pember because up until this point they have invoked their respective rights against self-incrimination. (Decl. Lawler, Nov. 5, 2007, Exs. 8, 9) However, the Parties were always aware that these were potentially useful witnesses. As Cendant's Counsel Lawler stated in a hearing in 2005, he didn't think the Government would permit a deposition of Corigliano, but admitted "Corigliano is important." (Tr. Hr.

January 19, 2005, 10:3-14.)  Plaintiffs attempted to schedule
their depositions in February of 2006, but to protect the
integrity of the separate criminal action in which both
Corigliano and Pember were witnesses, Judge Eaton, after
discussion with me, put a hold on those depositions.  Judge Eaton
specifically gave <u>Plaintiffs</u> permission to conduct those
depositions after the close of fact discovery stating that, "[i]f
<u>plaintiffs</u> wish to depose Ann Pember and/or Cosmo Corigliano,
they must wait until the witness is sentenced.  <u>Except for those</u>
<u>two depositions</u>...the parties must commence all fact discovery in
time to complete it by March 31, 2006."  (Ord. Judge Eaton, Feb.
22, 2006, at 1.)  (Ord. Judge Eaton, Feb. 22, 2006, at 1.)
Indeed, Defendants missed their opportunity to depose Corigliano
and Pember because they did not actively seek those depositions
in any way.  On August 10, 2006, Defendants sought permission of
the Court to move for summary judgment but asked that "any
schedule for such motions should be set for after Mr.
Corigliano's deposition occurs."  (Lawler Ltr. Aug. 10, 2007 at
Lawler Aff. Nov. 5, 2007, Ex. 6.)  As a result, Plaintiffs wrote
the Court: 1) citing Judge Eaton's Order which gave only
Plaintiff's permission to conduct those depositions, 2) noting
the discovery delays over the previous four years, 3) electing to
themselves "forego the depositions of both witnesses in the

11

interests of moving this case to trial as quickly as possible."

(Petrella Ltr. Aug. 10, 2007 at Lawler Aff. Nov. 5, 2007, Ex. 10

at 2)   The Court then denied Defendants permission to move for

summary judgment. (Aug. 22, 2007 Ord. 00-cv-1422, dkt # 135.)

Defendants sought review of that determination in the Second

Circuit.  (00-cv-1422, dkt # 147.)   In their briefing to the

Circuit Defendants noted:

> Neither the district court's orders <u>nor this
> Petition</u> concerns the <u>timing</u> of filing motions for
> summary judgment.   Petitioners have taken the
> position before the district court that the
> briefing on the summary judgment motions (as well
> as the trial itself) should not proceed until these
> two individuals – and particularly Cosmo Corigliano
> whom Plaintiffs put at the center of this case and
> who is actually named as a defendant here – are
> able to testify.   The district court did not rule
> on the timing issue but instead held that
> Petitioners cannot file summary judgment motions at
> all.

(Writ of Mandamus at 4, n. 1, Ct. App. 06-4844-op, Dkt. Entry

10/24/06.)   The Circuit instructed this Court to allow Defendants

to file their summary judgment motion, and on December 19, 2006

this Court set a schedule for summary judgment briefing.   (Ord.

Dec. 19, 2006.)   As a result it was well settled at the time

summary judgment briefing commenced in this matter that the

testimony of Corigliano and Pember could not become part of the

record – Defendants never noticed the deposition of those

individuals (despite over 62 depositions having been taken in the

12

case)[2] and they failed to seek review of the issue of the timing

of the motion before the Circuit. (Pls'. Opp. New 56.1, Gen. Ob.

2, at 3-6.) Indeed, discovery in this case lasted over 5 years,

and the depositions of Corigliano and Pember had been repeatedly

delayed by events in the separate criminal matter; proceeding

without their depositions was no doubt appropriate. (Id.) A

"district court has broad discretion to manage pre-trial

discovery and [the Circuit] review[s] its decisions on these

matters only for abuse of discretion." Wood v. F.B.I., 432 F.3d

78, 84-85 (2d Cir. 2005). In determining whether a district

court has exceeded its discretion, the Circuit has set for the

following factors: (1) the party's explanation for the failure to

comply with the discovery order; (2) the importance of the

testimony of the precluded witness; (3) the prejudice suffered by

the opposing party as a result of having to prepare to meet the

new testimony; and (4) the possibility of a continuance. See

Softel, Inc. v. Dragon Medical and Scientific Communications,

Inc., 118 F.3d 955, 961 (2d Cir. 1997) (citing Outley v. City of

---

[2] Plaintiffs subpoenaed Pember for deposition during the period, apparently unaware that she was on the U.S. Attorney's stay list (Gredd Ltr. Of Dec. 23, 2005 at 2, Lawler Aff. Nov. 5, 2007 at Ex. 4) – neither party issued a deposition notice for Corigliano presumably because of the stay, but Plaintiffs (unlike Defendants) consistently fought for that deposition. (Petrella Ltr, Aug. 11, 2006, Id. at Ex. 10.)

New York, 837 F.2d 587, 590-91 (2d Cir. 1988).  In this instance,
lengthy discovery delays, often as a result of Defendants'
conduct of the litigation, and the potential prejudice to
Plaintiffs mitigated in favor of cutting off discovery and
proceeding to summary judgment, as Ordered by the Circuit.

Even so, as it turns out, Corigliano and Pember were
sentenced prior to the submission of Reply briefing on the
summary judgment motion in this case. (Pls'. Opp. New 56.1 Stmt.
at Ex. 6.)  Certainly, Defendants failure to raise this with the
Court then, when it had been such an issue of contention up to
that point, prevents them from raising the issue now.

However, even though the Court finds that Defendants were on
notice to put forward these facts initially, and agrees with
Plaintiffs that the last minute attempts by Defendants to present
new facts is improper, out of an abundance of caution the Court
nevertheless reviews these additional facts to evaluate further
whether summary judgment is warranted.  With these new facts in
hand the Court finds, as before, that "[a]n examination of the
extrinsic evidence establishes that Section 5.11 only could have
meant cross-marketing and aggressive marketing."  Cendant, 507
F.Supp.2d at 413.  Further, Cendant has not presented any
evidence that calls into question the Court's earlier finding
that "Cendant failed to exercise those marketing obligations."

14

Id. at 414.

A. Previous Versions the SPA

Defendants argue that "the Court did not consider the most probative parol evidence – the history and previous versions of the SPA and Section 5.11, which clearly demonstrate that Cendant specifically rejected Plaintiffs' attempts to impose language that would have required particular activities or sales targets." (Def. Recon. Mem. of Law at 13.)  The Court did consider the previous versions of the SPA and Section 5.11; further, the Court comprehensively dealt with evidence as to the meaning of Section 5.11 in the September 7, 2007 Opinion.  Cendant, 507 F.Supp.2d at 392-409.

Furthermore, the inference Cendant draws from those earlier versions "that Cendant specifically rejected Plaintiffs' attempts to impose language that would have required particular activities or sales targets," is not objectively reasonable.  (Def. Recon. Mem. of Law at 13.)[3]  These draft versions are not probative of the issue before the Court: the intent of the parties expressed

_____

[3] Plaintiffs do not dispute that negotiations prior to the acquisition of Credentials by Cendant included a draft letter of intent sent by Plaintiffs to Cendant's Cosmo Corigliano including specific covenants regarding how Cendant would market Credentials, nor that Cendant rejected the inclusion of that language.  (Pls'. Mem. of Law at 11-12.)

15

in the binding SPA.  The covenants rejected by Cendant (which it now relies upon to create a genuine issue of material fact) all predate a critical turning point in the negotiations, the point at which the parties dropped the "earnout restriction" which limited Sellers' contingency payment to memberships added from the co-marketing agreements already in place at the time of the closing.[4]  Draft language pre-dating that shift in position is not probative of the meaning of the final, binding SPA.  Further, the covenants cited by Cendant do not displace the substantial evidence (discussed in the September 7, 2007 Opinion) demonstrating that the "historical practices" of Cendant's Comp-U-Card division were defined primarily by cross marketing and marketing aggressively.  Cendant, 507 F.Supp.2d at 413-414.

B. The Commercial Reasonableness of Cendant's Decision to Deprioritize Credentials

Cendant writes that "[b]ased on the changes to Credentials' marketing materials and telemarketing process and the results of the product's testing over time, it would not have been reasonable for Cendant to undertake the costs of proceeding with

---

[4] This critical move thereby ensured that Seller's compensation would be contingent on members added through Cendant's efforts.  (Pls'. Mem. of Law Recon. at 11-12; 56.1 Stmt. at 156-174).

cross-marketing the Credentials product." (Def. Recon. Mem. of Law at 19.)[5]  In support, Cendant cites the Report of Robert C. Blattberg, which they argue "concluded that it was an appropriate rationale for Cendant to dedicate more market resources to PrivacyGuard."  (Id. at 20.)  Cendant points to the Report, not addressed in the September 7, 2007 Opinion, as evidence of the reasonableness of Cendant's actions.  (Def. New 56.1 at Ex. 59.)

First, the Blattberg report was included in the submissions before the Court on the original motion (Lawler Aff. Mar. 16, 2007 at Ex. 97.)  Although not specifically addressed by the Court, it was nevertheless considered at that time.  Second, the Court notes that the Blattberg Report is based on evidence produced too late in the discovery process to be granted consideration in the first instance.  (Pls'. Recon. New 56.1 at ¶ 73.)  Again, here, Cendant asks the Court to credit late-produced and/or destroyed evidence.[6]

_____

[5] The Court will not address the change from one-step to two-step marketing as that issue was dealt with exhaustively in September 7, 2007 opinion.

[6] Further, Cendant misapprehends the inquiry.  The question was not the objective reasonableness of Cendant's actions.  Their use of the Blattberg report seeks to read out of the contract the phrase, "to continue to be marketed substantially in accordance with the general historical practices of Cendant's Comp-U-Card division."  Whatever the Blattberg report concludes it does not disrupt the holding of this Court that the extrinsic evidence demonstrates that "commercially reasonable" could not have

17

Finally, Cendant relies on the following section of
Maloney's deposition testimony to argue that testing products was
one of the historical practices of the CUC division and that
Sellers anticipated the possibility that, as between PrivacyGuard
and Credentials, only one could win out:

> A. "...I think they [Cendant] acknowledged that our
> product put up against Privacy Guard was a better
> product...and I think they were – what they said to
> us is they were going to market our product.   I
> assumed they were going to drop their product and
> market exclusively to ours.   I subsequently, of
> course, found out they did the opposite but"
>
> Q. "How did you make that assumption, they were
> going to drop their product?"
>
> A. "Because they told us they were going to market
> our product to their whole file so you don't market
> competitive products to the same file so the only
> way they are going to do it, if they are going to
> market ours, is drop their own."
>
> "...This was an ongoing continuum, so there were
> numerous   conversation,   face-to-face   meetings,
> telephone conversations, that type of thing.   And
> it was a hard pill for us to digest, getting less
> than 175 million in cash.   So one of the reasons we
> would have accepted that was the fact that they
> were assuring us that we would earn it back in the
> contingent payout."

(Maloney Dep. at 298-300).   What this testimony in fact

demonstrates is that the SPA was understood by the Sellers to

---

included the possibility that Cendant drop Credentials in favor
of PrivacyGuard when the SPA hinged on the ability of Cendant to
achieve the earnout sought by Sellers through the cross-marketing
and marketing aggressively of Credentials.

require Cendant to cross-market and market aggressively Seller's

product, Credentials, in order for Sellers to achieve their

earnout.   The fact that testing competing products may have been

one of the historical practices of Cendant, does not undermine

the Court's conclusion that cross-marketing and aggressive

marketing were also hallmarks of the CUC division, and understood

by the parties to be incorporated into the SPA.

C. Representations Made During the Negotiation of the SPA

In the September 7, 2007 Opinion, the Court relied in part

on Plaintiffs' (then uncontested) account of the oral

representations made by Cendant executives, as placed in the

record by Credentials executives.   Cendant now states that "[t]o

the extent that the oral discussions between the parties are

proper parol evidence, those discussions are in dispute."   (Def.

Mem. of Law Recon. at 14.)   Cendant has put into the record short

declarations of Cosmo Corigliano, Ann Pember, and Samuel Katz

which address these negotiations.

Even considering the new declarations offered by Corigliano,

Pember, and Katz, their short and conclusory statements are

insufficient to manufacture a genuine issue of material fact.   In

his declaration, Corigliano states that "at no time during our

negotiations with Credentials did I guarantee, and I am confident

19

that I never predicted or promised to anyone at Credentials,

that: a) Credentials would receive any part or all of the

contingent payment (of up to $50 million), b) it would meet (much

less exceed) its new member budget or c) it would receive the

failed IPO price ($175 million) through the earn-out." (Def. New

56.1 Stmt. at Ex. 21,¶ 7.)  He further writes, "I recently

reviewed Section 5.11 of the SPA.  I believe that Section 5.11 is

a standard provision in these types of contracts."[7]  (Id. at ¶

5.)  He admits "discussing with Credentials representatives

Cendant's marketing abilities and practices" but states that "I

did not guarantee any particular marketing approach, whether it

was cross marketing or something else.  I did not tell anyone at

Credentials that Section 5.11 was a guarantee to cross-market,

nor did I or do I now believe that this is what Section 5.11

---

[7]  Plaintiffs correctly point out that Corigliano is a felon
and has admitted to lying to the FBI, federal prosecutors postal
inspectors in a separate criminal proceeding, as well as lying to
people in the business world.  (Pls'. Opp. New 56.1 at Ex. 9, Tr.
Pg. 7611; Cendant, 507 F.Supp.2d at 392)  Indeed Corigliano said
under oath that, "I lied to a lot of people over a number of
years."  (Id.)  Plaintiffs also point out that Cendant paid his
legal fees which totaled perhaps as much as eight million
dollars.  (Pls'. Recon. New 56.1, Gen. Ob. 2, at 6.) However,
"[i]n ruling on a motion for summary judgment, a court 'is not to
weigh the evidence but is instead required to view the evidence
in the light most favorable to the party opposing summary
judgment, to draw all reasonable inferences in favor of that
party, and to eschew credibility assessments." Joyce v. Curtiss-
Wright Corp., 171 F.3d 130, 133 (2d Cir. 1999) (citing Weyant v.
Okst, 101 F.3d 845, 854 (2d Cir. 1996)).

means."   (Id. at ¶ 12.)

To begin with, as already discussed, a declaration such as this would not have been appropriately included in the summary judgment record absent a request from one of the Parties to reopen discovery after the two were sentenced but prior to the completion of the briefing.   See supra III.   Further, this carefully worded statement offers little illumination.   It strains credulity that the terminology "to be marketed substantially in accordance with the general historical practices of Cendant's Comp-U-Card division for marketing products similar to those offered by [Credentials]" is "standard" or boilerplate commercial language.   In addition, at no point does Corigliano state what he believed the disputed provisions of the SPA meant at the time he negotiated them.   He says he did not "guarantee" any particular marketing approach, but he does not deny making the representations to Maloney and Weinstein, relied upon by the Court, which claimed that he represented that cross-marketing would be used.   Nor does Corigliano explain why the earnout restriction was taken out of the final SPA (thereby causing the contigency payment to hinge on Cendant's efforts).   He also does not comment on the Wall Street Journal article from April 14, 1995, which reported that "Cendant, which is paying $78 for each Credentials member, said it plans to expand the business by

21

cross-marketing with its other products and services." (Pls'.
Orig. 56.1 Resp. at Ex. 32.)

Likewise, the new Pember declaration does little to
strengthen Cendant's case.[8]  The closest that any of the
declarations comes to creating an issue of material fact is
Pember's statement that, "I never made any representations to
anyone at Credentials regarding what efforts would be made by
Cendant in marketing Credentials' products or what results
Credentials could expect to achieve after its acquisition by
Cendant."   (Def. New 56.1 Stmt. at Ex. 6, ¶ 10.)  But this ten
paragraph declaration, when viewed in light of the veritable
mountain of evidence in this case, does little to alter the one-
sided nature of the evidence as to the meaning of the contract
terms, especially because Pember is only one of several people
Sellers describe as having made such representations, and given
that Pember herself writes that it is "possible that I may have
had interactions with other individuals affiliated with
Credentials (although, I do not, at this time, recall any)".
(Cendant, 507 F.Supp. 2d at 399-400, Def. New 56.1, Ex. 6 at ¶

---

[8]  Like Corigliano, Pember is also a felon, having pleaded
guilty pursuant to a cooperation agreement to conspiracy to
commit mail and wire fraud in connection with her participation
in the misstatement of CUC and Cendant's financial results, in
June 2000, for which she was sentenced in January of 2007.
(Def. New 56.1 Stmt. at Ex. 6, ¶ 3.)

9.)

Finally, the new Declaration of Samuel Katz arrives too late to warrant consideration by the Court given that his deposition testimony was in the record during the initial summary judgment motion and fact discovery in this action has long since closed. But, even granting consideration, his new testimony obfuscates rather than clarifies any of the critical issues in this case. He now says, "I never guaranteed, promised or in any way told the Sellers that they would earn any contingent payment, nor did I guarantee, promise, predict or in any way tell the Sellers that they would earn a total of $170 million for the sale. I also did not guarantee, promise or in any way tell the Sellers that they would 'get back the IPO price' as a result of any contingent payment." Indeed, it appears that his new declaration comes perilously close to contradicting his prior deposition testimony in this matter. (Pls'. New 56.1 Resp. at Ex. 18, 67-70.) He was asked in his deposition: "[w]hat conversations do you recall that you had with representatives of the sellers regarding this provision 5.11?" (Pls'. Opp. New 56.1, Ex. 18 at 74.) Upon objection, the time frame of the question was specified as "before the acquisition closed." (Id.) Katz responded, "I don't recall the specific conversations." (Id.) However, viewing this Declaration in the light most favorable to Cendant, such that it

23

doesn't contradict Katz's prior sworn testimony, he is merely saying now that he did not "guarantee" a particular earnout amount, but there were "likely" statements made "regarding Cendant's intentions with respect to growing the membership base of Credentials after Cendant acquired the company," indeed he has admitted he might have made them himself.  (Pls'. New 56.1 Resp. at Ex. 18, 67-70.)  Therefore, Katz has submitted no new evidence that would undermine the Court's finding that Section 5.11 was understood by the Parties to be a statement that cross-marketing be used, and that Cendant would market aggressively Credentials product.[9]  The rest of Katz's declaration involves statements he alleges to have made to Sellers representatives; however, because

---

[9] In the September 7, 2007 Opinion the Court quoted the following statement, "The people at Credentials, Cosmo Corigliano and Sam Katz were the ones, Anne Pember as well, that told me that they would use their muscle and we would far exceed the numbers that we had anticipated in terms of net new members because of the efforts that Cendant would make separate and apart from adding members that Credentials was intending to add to their core membership base." Cendant, 507 F.Supp.2d at 399 -400; (Maloney Dep., 48:20-25, at Pls'. 56.1 Stmt., Ex. 14; see also Maloney Dep., 49:15-23; Thompson Dep. 257:9-258:17, at Pls'. 56.1 Stmt., Ex. 29.).  That statement appears uncontradicted by Corigliano and Katz.  The Court also stated that "Maloney, as well as Credentials' CFO Allan Weinstein (Ex. 41, Weinstein Dec. ¶ 1), further testified that Defendant Katz told them during negotiations that despite any contingent payment clause, Sellers would 'get back what [they] originally discussed, the [$175 million] IPO price.'" Id. (citing Maloney Dep. 55:16-17; Weinstein Dep. 260:13-17, at Pls'. 56.1 Stmt., Ex. 19.). That statement may be contradicted Katz's new declaration at ¶ 4. (But see Def. New 56.1 at Ex. 24.)

he provides no time frame as to when those representations were made it is impossible to glean any useful information from those statements.  Finally, Katz, like Corigliano (and Pember), fails to explain why the earnout restriction was taken out of the final SPA.

At this late stage in the game, the issues and probative evidence having been refined by the Court's September 7, 2007 Opinion, Cendant's failure to address the Court's rationale in a detailed and forthright manner practically amounts to an admission.  These eleventh-hour, artfully drafted Declarations do not create material facts that require submission to a jury.

IV. The Court's Damage Award Was Based on the Correct Formula

Cendant writes that "[a]s a matter of New York law, Plaintiffs must show the amount of money they expected to receive if the contract had been performed – that is, if Cendant had not allegedly breached Section 5.11." (Def. Recon. Rep. Mem. of Law at 7.)  The Court again holds that general damages are appropriate here where the damages were the "direct and proximate damages" resulting from Cendant's breach.  <u>Tractebel Energy Marketing, Inc. v. AEP Power Marketing, Inc.</u>, 487 F.3d 89, 110-11 (2d Cir. 2007).  The Circuit has recently addressed the issue of damages in some detail.

> It has long been established in New York that a
> breaching party is liable for all direct and
> proximate damages which result from the breach.
> The damages, however, must be not merely
> speculative, possible, and imaginary, but they must
> be reasonably certain and such only as actually
> follow or may follow from the breach of the
> contract. Certainty, as it pertains to general
> damages, refers to the fact of damage, not the
> amount. For when it is certain that damages have
> been caused by a breach of contract, and the only
> uncertainty is as to their amount, there can rarely
> be good reason for refusing, on account of such
> uncertainty, any damages whatever for the
> breach....The plaintiff need only show a stable
> foundation for a reasonable estimate of the damage
> incurred as a result of the breach....and the party
> who has caused the loss may not insist on
> theoretical perfection.

Id. at 110-111 (citations and quotations omitted).  This notion,

that the party who has caused the loss may not insist on

theoretical perfection in the calculation of damages, is

particularly apt here where the breaching party, Cendant, has

lost records that would make it possible to more accurately

determine a damages award.  (Petrella Sanctions Decl. at ¶¶ 30,

64-74.)  The Court has already awarded sanctions for Cendant's

failure to disclose earlier the fact of its having lost

Credentials' 1998 financial data (financial and marketing reports

detailing Credentials' performance in 1998 during the year

following the acquisition) - such reports would have been

extremely useful in determining a more precise damages award.

Cendant, 507 F.Supp.2d at 435-36.  Because the Court has held

that Cendant, not Sellers, was in breach of the contract, and

because Cendant has lost documents it was required to keep

relating to Credentials' performance in 1998, Cendant can no

longer require Plaintiffs to prove the amount of their loss with

more certainty.  Cendant has not presented any evidence tending

to show that the damages awarded were not a "reasonable estimate"

of the damages incurred by their breach.

CONCLUSION

For the reasons stated herein, Cendant Corporation's Motion to Reconsider is DENIED.  Plaintiffs' Contingent Motion to Reconsider is DENIED as untimely and/or moot.

Pursuant to this Court's September 7, 2007 Opinion and grant of an extension of time on October 2, 2007, Plaintiffs shall file and serve within thirty days of the date of this ORDER an affidavit which justifies their attorneys' fees.  Cendant shall respond, if it so desires, within thirty days of receipt of Sellers' affidavit.


SO ORDERED.

DATED:    New York, New York

          May 7, 2008

                                    Deborah A. Batts
                              United States District Judge